**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. ___26-20293-CR-LEIBOWITZ/HERNANDEZ___
18 U.S.C. § 371

**UNITED STATES OF AMERICA**

**v.**

**BLUE OCEAN INTERNATIONAL**
**BANK, LLC,**

          **Defendant.**

_____/

> FILED BY____*AT*____D.C.
>
> *Jul 17, 2026*
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - FTL

**INFORMATION**

The United States Attorney charges that:

**General Allegations**

At all times relevant to this Information:

**A.     Overview**

1.      Beginning in or around October 2016 and continuing until in or about August 2022 (the "relevant period"), defendant **BLUE OCEAN INTERNATIONAL BANK, LLC** (hereinafter referred to as "**BLUE OCEAN**"), acting through certain of its officers and employees, conspired to violate the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5318(g), 5322, by agreeing to willfully fail to file reports of suspicious transactions relevant to possible violations of law or regulations with the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury.  During the relevant period, **BLUE OCEAN** provided its customers access to the U.S. financial system while seeking to shield the customers' financial transactions and activities from U.S. regulators and law enforcement by willfully conspiring to hinder and prevent **BLUE**

**OCEAN** compliance personnel from filing required Suspicious Activity Reports ("SARs") with FinCEN.

B.     **Relevant Entities and Individuals**

2.     On or about July 26, 2016, **BLUE OCEAN** was incorporated in the Commonwealth of Puerto Rico. **BLUE OCEAN** was a wholly-owned subsidiary of Blue Ocean International Holding LLC, an entity incorporated in Puerto Rico, which in turn was a wholly-owned subsidiary of IRC Holding Company, an entity incorporated in the Cayman Islands. During the relevant time, **BLUE OCEAN**'s principal office was located in San Juan, Puerto Rico.

3.     On or about October 17, 2016, the Office of the Commissioner of Financial Institutions (hereinafter referred to as "OCFI"), an office of the Department of Treasury of Puerto Rico that supervises and regulates Puerto Rico's financial sector, granted **BLUE OCEAN**'s application for a license to operate as an International Financial Entity (hereinafter "IFE") pursuant to the International Financial Center Regulatory Act, Act No. 273 (Sep. 25, 2012), as amended by Act No. 154 (Sep. 10, 2014) (hereinafter "IFCR Act").

4.     **BLUE OCEAN**'s IFE license permitted it to, among other things, "[c]arry out any banking transactions allowed by [the ICFR Act] in the currency of any country, or in gold or silver, and participate in foreign currency trade," and "[e]ngage in such other activities as are expressly authorized by the regulations or orders of the Commissioner [of OCFI], or are incidental to the execution of the services authorized by this Act and the Regulations of the Commissioner." *See* ICFR Act §§ 12(a)(8), 12(a)(17).

5.     **BLUE OCEAN** provided custodial banking services to customers who were non-residents of the United States and its territories. **BLUE OCEAN** opened accounts, accepted deposits, maintained custody of assets, and executed transactions for customers, among other

2

services provided.   **BLUE OCEAN** maintained assets of its customers at banks located in Switzerland, the United Kingdom, the Bahamas, the Continental United States, and elsewhere outside of Puerto Rico.

6.      Bank Executive 1 was a co-founder of **BLUE OCEAN** and the sole owner of IRC Holding Company.  Bank Executive 1 served as the president of **BLUE OCEAN** from on or about October 17, 2016, to on or about January 21, 2021.

7.      Bank Executive 2 served as the chief executive officer of **BLUE OCEAN** from on or about November 1, 2016, to on or about November 1, 2019.

8.      Bank Executive 3 was a co-founder and a former minority owner of **BLUE OCEAN**.  Bank Executive 3 served as the chief financial officer of **BLUE OCEAN** from in or around January 2019 to in or around December 2019 and as chief executive officer of **BLUE OCEAN** from in or around December 2019 until on or about October 1, 2023.  Bank Executive 3 previously served as a consultant to **BLUE OCEAN**.

9.      During the relevant period, **BLUE OCEAN** operated in the Southern District of Florida in that **BLUE OCEAN** transferred funds from its accounts at financial institutions in foreign jurisdictions to customer accounts at financial institutions located in the Southern District of Florida.

C.      **The Bank Secrecy Act**

10.     The BSA, codified at 31 U.S.C. §§ 5311–5326, as implemented through related federal regulations, was enacted by Congress to address criminal money laundering activities utilizing financial institutions.

11.     Title 31, United States Code, Section 5318(g), and related implementing regulations, including 31 C.F.R. § 1020.320, required banks to file SARs with FinCEN for any

transaction conducted through the bank that involved at least $5,000 in funds, and the bank knew, suspected, or had reason to suspect that the transaction: (i) involved funds derived from illegal activity or was intended or conducted in order to hide or disguise funds or assets derived from illegal activity as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation; (ii) was designed, whether through structuring or other means, to evade any regulations promulgated under the BSA; or (iii) had no business or apparent lawful purpose or was not the sort in which the particular customer would normally be expected to engage, and the bank knew of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction. *See* 31 U.S.C. § 5318(g); 31 C.F.R. § 1020.320(a).

12.     The BSA's implementing regulations provided that a bank must file a SAR no later than 30 calendar days after the date of initial detection by the bank of the underlying facts constituting the basis for the SAR filing. If the bank was unable to identify a suspect on the date of the detection of the incident requiring the filing, it could delay filing a SAR for an additional 30 calendar days to identify a suspect. In no case could reporting be delayed more than 60 calendar days after the date of initial detection of a reportable transaction. *See* 31 C.F.R. § 1020.320(b)(3).

13.     After it began operating as an IFE on or about October 17, 2016, **BLUE OCEAN** constituted a "financial institution" as defined by the BSA and its implementing regulations. *See* 31 U.S.C. § 5312(a)(2)(B); 31 C.F.R. § 1010.100(t)(1); 31 C.F.R. § 1010.100(hhh) (defining "United States" as: "The States of the United States, the District of Columbia, the Indian lands (as that term is defined in the Indian Gaming Regulatory Act), and the Territories and Insular Possessions of the United States"). Accordingly, **BLUE OCEAN** was required to file SARs with FinCEN during the relevant period. *See* 31 U.S.C. § 1010.320 ("Each financial institution (as

4

defined in 31 U.S.C. 5312(a)(2) or (c)(1)) should refer to subpart C of its financial institution part in this chapter for any additional suspicious transaction reporting requirements."); 31 C.F.R. § 1020.320; 81 Fed. Reg. 58425 (Aug. 25, 2016) ("Although banks that lack a Federal functional regulator have not been required to establish an anti-money laundering program, they are required to comply with many other BSA requirements. For example, banks that lack a Federal functional regulator still must file currency transaction reports ('CTRs') and suspicious activity reports ('SARs'), and make and maintain certain records.").

### D.    Regulation and Examination by OCFI

14.    As an IFE, **BLUE OCEAN** was regulated by OCFI.

15.    Section 8(f) of the IFCR Act provided in part that "[e]very holder of an international financial institution license issued in accordance with the provisions of this Act shall ... file currency transaction or suspicious activity reports required by the Bank Secrecy Act and the USA Patriot Act, when necessary...."

16.    Section 8(d) of the IFCR Act mandated that for each year an IFE renewed its license with OCFI, the IFE was required to submit an affidavit to OCFI, signed by the IFE's chief executive officer, attesting to the IFE's compliance with the BSA and referencing the procedures and systems that the institution had adopted to comply with the terms of the BSA.

17.    On or around January 15, 2020, OCFI initiated an examination of **BLUE OCEAN**'s BSA/AML compliance (the "BSA Exam"). The BSA Exam assessed **BLUE OCEAN**'s system of internal controls to maintain compliance with bank secrecy regulations and suspicious activity monitoring practices, among other things, for the period of October 17, 2016, to September 30, 2019. OCFI concluded the BSA Exam on or about November 23, 2020.

5

18.     The BSA Exam found "critical deficiencies in [**BLUE OCEAN**'s] BSA/AML compliance program" and "severe apparent violations of laws and regulations."  Among other things, OCFI concluded that "[d]uring 2016 and 2017, management failed to implement a system for monitoring, detecting, and reporting suspicious activity."  According to OCFI's findings, **BLUE OCEAN** implemented a manual monitoring system at the beginning of 2018, but among other things, **BLUE OCEAN** provided its BSA/AML Officer with incomplete transaction logs for purposes of conducting transaction monitoring, failed to grant the BSA/AML Officer access to its banking reporting system until March 2019, and only monitored cash transactions and trades. From the sample covered during the BSA Exam, OCFI concluded that "[**BLUE OCEAN**] is in apparent violation for failing to file SARs of six (6) suspicious wire transfers transactions and five (5) untimely investigations that led to SAR filing[s]."

19.     OCFI discussed the findings of the BSA Exam with certain members of **BLUE OCEAN's** management, including Bank Executive 3, on or about September 18, 2020, and on or about January 12, 2021, and with members of **BLUE OCEAN**'s board of directors and management, including Bank Executive 3, on or about February 24, 2021.  OCFI summarized the findings of the BSA Exam in a letter to the chairman of **BLUE OCEAN**'s board dated March 12, 2021.

20.     On or about March 30, 2021, **BLUE OCEAN** entered into a consent order with OCFI to resolve violations of laws and regulations, including deficiencies in its BSA compliance. The consent order required **BLUE OCEAN** to, among other things: (1) implement "a process to reasonably ensure the timely identification and accurate reporting of known or suspected criminal activity, as required by the suspicious activity reporting provisions"; and (2) "improve policies, procedures, processes, and systems for monitoring, detecting, and reporting suspicious activity."

Among others, Bank Executive 3 signed the board resolution authorizing a company representative to accept the consent order on behalf of **BLUE OCEAN**.

21.     On or about December 22, 2022, OCFI entered into an agreement with **BLUE OCEAN**, Blue Ocean International Holding LLC, and IRC Holding Limited for the voluntary liquidation and dissolution of **BLUE OCEAN**, effective January 9, 2023.

### Conspiracy to Willfully Fail to Report Suspicious Transactions
### (18 U.S.C. § 371)

22.     The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

23.     Beginning in or around October 2016 and continuing through in or around August 2022, in the Southern District of Florida and elsewhere, the defendant,

### BLUE OCEAN INTERNATIONAL BANK, LLC,

did knowingly and willfully, combine, conspire, confederate, and agree with others known and unknown to the United States Attorney, to commit an offense against the United States, that is willfully failing to report certain suspicious transactions relevant to a possible violation of law or regulation, a violation of Title 31, United States Code, Sections 5318(g) and 5322.

### OBJECT AND PURPOSE OF THE CONSPIRACY

23.     It was the object and purpose of the conspiracy for **BLUE OCEAN** and its coconspirators to unlawfully enrich themselves by providing its clients residing outside of the United States and its territories the ability to deposit funds into U.S. financial institutions by failing to comply with the BSA, more specifically, by willfully failing to file SARs and thereby enabling **BLUE OCEAN** to conceal the identities of its clients, the sources of their assets, the geographic locations of the clients' businesses, the alleged purpose of such businesses, and other information

and facts from the scrutiny of other financial institutions, law enforcement agencies, FinCEN, and other regulatory agencies that assess such transactions for potential criminal activity.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **BLUE OCEAN** and its coconspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

24.    Throughout the conspiracy, **BLUE OCEAN** executed transactions on behalf of customers while knowing, suspecting, or having reason to suspect that the transactions involved funds derived from illegal activity or had no business or apparent lawful purpose, but **BLUE OCEAN** failed to file timely SARs on those transactions.

25.    **BLUE OCEAN,** through Bank Executive 1, Bank Executive 2, Bank Executive 3, and other coconspirators, impeded and prevented **BLUE OCEAN**'s compliance officers from filing timely SARs as required by law.

26.    **BLUE OCEAN,** through Bank Executive 1, Bank Executive 2, Bank Executive 3, and other coconspirators, attempted to manipulate certain compliance officers and prevented the filing of SARs regarding the bank's customers and transactions.

27.    **BLUE OCEAN,** through Bank Executive 1, Bank Executive 2, Bank Executive 3, and other coconspirators, obstructed the duties and responsibilities of the compliance officers which resulted in a high turnover of employees in the compliance department.

28.    During the relevant period, Bank Executive 1 and Bank Executive 2 maintained exclusive control of certain customer accounts and refused to permit **BLUE OCEAN**'s compliance officer and other compliance personnel to conduct customer due diligence on those customers or review account activity for suspicious transactions.

8

29.     Defendant **BLUE OCEAN,** through Bank Executive 1, Bank Executive 2, Bank Executive 3, and other coconspirators, impeded access of the compliance officers to the corporate computer system and access to needed records, including not providing access to transaction records, custodial accounts in foreign countries, and account reconciliations.

30.     **BLUE OCEAN,** acting at the direction of Bank Executive 1, Bank Executive 2, Bank Executive 3, and other coconspirators, failed to conduct required customer due diligence, failed to conduct required transaction monitoring of customer transactions, failed to investigate suspicious transactions relevant to possible violations of law or regulation, and ultimately failed to file timely SARs on such suspicious transactions.

31.     **BLUE OCEAN** executed transactions on behalf of its customers with other U.S. financial institutions and, at times, those other U.S. financial institutions alerted **BLUE OCEAN** to the suspicious nature of the transactions.  **BLUE OCEAN** frequently failed to file SARs even when notified of the suspicious nature of the transactions in question by other U.S. financial institutions.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its object and purpose, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

**A.     BLUE OCEAN failed to file timely SARs on Customers 1 and 2.**

32.     On or about October 31, 2016, and on or about October 10, 2017, **BLUE OCEAN** opened two accounts for Customer 1, an entity incorporated in Luxembourg.  The beneficial owner of Customer 1 was Customer 2, a Venezuelan national.  A Compliance Memo in the **BLUE OCEAN** files dated May 19, 2016, reported a finding that Customer 2 was linked to accounts held

in an offshore bank which were under investigation by various government and law enforcement agencies.

33.     On or about November 4, 2016, **BLUE OCEAN** compliance personnel identified negative news concerning Customer 2 and sent an email to **BLUE OCEAN** executives, including Bank Executive 1 and Bank Executive 2.  The email contained links to media articles reporting that Customer 2 allegedly laundered $154,000,000 in funds stolen from a state-owned oil company in Venezuela and those funds were subsequently used to pay bribes to the oil company's executives and other Venezuelan government officials.  **BLUE OCEAN** nonetheless opened the requested accounts for Customer 1 and allowed funds to be transacted through the account.

34.     Between on or about October 31, 2016, and on or about January 11, 2017, Customer 1's account at **BLUE OCEAN** received four incoming wire transfers, totaling more than $1.3 million.  Those four wire transfers lacked certain basic transaction details such as the purpose of the payment.

35.     On or about July 27, 2017, **BLUE OCEAN** opened an account in the name of Customer 2.  Customer 2's account was immediately funded, on or about July 27, 2017, with an incoming wire transfer of approximately $2,357,694.58.  That incoming wire transfer on or about July 27, 2017, lacked certain basic transaction details. On or about July 31, 2017, Customer 2 sent an outgoing wire transfer of approximately $750,000.00 from his account at **BLUE OCEAN**.  That outgoing wire transfer on or about July 31, 2017, lacked certain basic transaction details such as the purpose of the payment.

36.     On or about December 14, 2017, Bank Executive 2 and **BLUE OCEAN**'s compliance officer circulated a memo stating that Customer 2 had been indicted and arrested in

10

Venezuela for laundering $1.6 billion. The memo stated that **BLUE OCEAN** would terminate its relationship with Customer 2.

37.     On or about January 17, 2018, Customer 2 closed his account at **BLUE OCEAN**. On or about January 19, 2018, Customer 2 transferred $1,590,000 from his account at **BLUE OCEAN** to a Swiss bank account.

38.     On or about February 7, 2018, **BLUE OCEAN** closed one of Customer 1's accounts.

39.     On or about May 9, 2018, more than one year after **BLUE OCEAN** first identified negative news linking Customer 2 to the bribery and money laundering scheme that would ultimately result in his arrest in Venezuela and approximately five months after **BLUE OCEAN** learned of Customer 2's actual arrest, **BLUE OCEAN** filed a SAR naming Customers 1 and 2 as suspects and reporting the arrest of Customer 2 for money laundering. This was the first SAR that **BLUE OCEAN** filed on Customer 1 or Customer 2.

40.     **BLUE OCEAN** continued to allow Customer 1 to execute transactions from its second account at **BLUE OCEAN** until at least in or around July 2018. **BLUE OCEAN** maintained that second account for Customer 1 until at least in or around September 2018.

41.     In or around September 2018, **BLUE OCEAN** filed a 90-day supplemental SAR, noting that one of Customer 1's accounts was still open and held approximately $1,667,846.33. The SAR indicated that **BLUE OCEAN** would close Customer 1's second account.

**B.    BLUE OCEAN failed to file timely SARs on Customers 3 and 4 and Bank Executive 2.**

42.     On or about September 7, 2017, **BLUE OCEAN** opened an account for Customer 3, who was reportedly a restaurant owner in Kuala Lumpur, Malaysia and a commodities dealer in gold and palm oil. On or about June 11, 2018, **BLUE OCEAN** opened an account for Customer

11

4, who was also reportedly a restaurant owner in Kuala Lumpur, a commodities dealer in diesel oil, palm oil, and gold bullion, and a business partner of Customer 3.  Bank Executive 2 solicited Customers 3 and 4 to **BLUE OCEAN**.

43.     On or about June 8, 2018, Customer 3's account at **BLUE OCEAN** received an incoming wire transfer of approximately $1,960,000, which purportedly constituted proceeds from the sale of gold.  On or about June 11, 2018, Customer 3 transferred approximately $120,000 from his account at **BLUE OCEAN** to the personal account of Bank Executive 2.  On or about June 12, 2018, Customer 3 executed two transfers, totaling approximately $800,000, from its account at **BLUE OCEAN** to Customer 4's account at **BLUE OCEAN**.  On or about June 13, 2018, Customer 3 transferred approximately $1,000,000 from his account at **BLUE OCEAN** to a personal account at another financial institution.

44.     On or about August 7, 2018, following a referral from Bank Executive 3 and another **BLUE OCEAN** employee, Compliance Officer 1 reviewed these transactions involving Customers 3 and 4, including the payment of approximately $120,000 from Customer 3 to Bank Executive 2, for suspicious activity.  Bank Executive 2 claimed that the $120,000 payment from Customer 3 to Bank Executive 2's personal account related to the repayment of a loan previously made by Bank Executive 2 to Customer 3.  Bank Executive 2 prevented Compliance Officer 1 from filing a SAR on these transactions and refused to close Customer 3's account, as Compliance Officer 1 recommended.

45.     On or about September 24, 2019, after an independent audit requested by and paid for by **BLUE OCEAN** raised flags about this series of transactions involving Customers 3 and 4 and Bank Executive 2, **BLUE OCEAN** filed a SAR naming Customers 3 and 4 and Bank Executive 2 as suspects.  **BLUE OCEAN** filed the SAR—which was the first on this series of

12

transactions—more than 13 months after Compliance Officer 1 identified the suspicious nature of the payments. Among other things, the SAR narrative stated that Bank Executive 2, the CEO of **BLUE OCEAN**, had allegedly benefitted monetarily "by being bribed by the clients," and that "[w]hen the CEO knew the transactions were referred by the operations department, [he] got upset and put pressure on the new Compliance Office not to file a SAR." The SAR further noted that "[on] various occasion[s] the Compliance Officer [who] was pressure[d] not to file a SAR, requested the CEO to close the account which he insisted in not to do it because the client wants to deposit money soon."

C. **BLUE OCEAN failed to file timely SARs on Customer 5**

46. On or about July 7, 2017, **BLUE OCEAN** opened an account for Customer 5.

47. On or about May 29, 2019, Customer 5 transferred approximately $300,000 from his/her account at **BLUE OCEAN** to a personal account at Financial Institution 1 in the Southern District of Florida.

48. On or about December 12, 2019, Customer 5 transferred approximately $50,000 from his/her account at **BLUE OCEAN** to a personal account at Financial Institution 1.

49. On or about December 17, 2019, Customer 5 transferred approximately $100,000 from his/her account at **BLUE OCEAN** to a personal account at Financial Institution 1.

50. On or about February 6, 2020, Customer 5 transferred approximately $110,000 from his/her account at **BLUE OCEAN** to a personal account at Financial Institution 1.

51. On or about March 2, 2020, Customer 5 transferred approximately $140,000 from his/her account at **BLUE OCEAN** to a personal account at Financial Institution 1.

52. On or about June 2, 2020, Financial Institution 1 filed a SAR naming Customer 5 and **BLUE OCEAN** as subjects.

13

53.     In or around 2023, after a regulatory examination was conducted by the OCIF, **BLUE OCEAN** initiated a look-back review, which was performed by an independent third-party.

54.     On or about December 27, 2023, **BLUE OCEAN** filed a SAR naming Customer 5 as a suspect, relating to over $11 million in transactions that occurred from in or around 2017 through in or around 2021. **BLUE OCEAN** filed the SAR, which was the only SAR filed on this customer after **BLUE OCEAN** became aware of a federal investigation. The account for Customer 5 was opened in or around 2017. Customer 5 informed **BLUE OCEAN** that his/her source of wealth was from an inheritance, yet **BLUE OCEAN** failed to obtain any evidence of this statement to ensure the funds were not from an illicit source. The account transactions related to a purported shell real estate firm through which Customer 5 was purportedly investing in real estate. **BLUE OCEAN** failed to conduct due diligence on Customer 5 by collecting real estate contracts, deeds of sale, or other documents related to the real estate investments. In addition, **BLUE OCEAN** failed to identify the purpose of the transactions which were almost entirely deposits to Customer 5's accounts rather than payments to the real estate firm for purported investments.

D.     **BLUE OCEAN executives obstructed compliance personnel from conducting transaction monitoring and filing SARs.**

55.     In or around July 2018, **BLUE OCEAN** retained Compliance Officer 1 to lead its BSA/AML compliance program. Compliance Officer 1's duties and responsibilities included, among other things, conducting transaction monitoring for suspicious activity and filing SARs with FinCEN. Compliance Officer 1 was **BLUE OCEAN**'s sixth compliance officer since its formation two years earlier.

56.     When Compliance Officer 1 started in or around July 2018, **BLUE OCEAN** did not have a transaction monitoring system to identify suspicious transactions for potential SAR

filings.  Compliance Officer 1 began a manual transaction review process in which Compliance Officer 1 reviewed transaction binders containing printed copies of transaction logs, approved payment requests, and transaction order forms.  Throughout Compliance Officer 1's tenure, **BLUE OCEAN,** through its executives, regularly denied Compliance Officer 1's requests for additional information regarding customers and transactions.

57.    After joining **BLUE OCEAN** in or around July 2018, Compliance Officer 1 asked Bank Executive 2 for a list of all **BLUE OCEAN** accounts, which Bank Executive 2 provided. According to that list, numerous accounts had been opened prior to the incorporation and licensing of **BLUE OCEAN**.  Bank Executive 1 explained to Compliance Officer 1 that those accounts had been transferred from a company that Bank Executive 1 operated in Dubai, United Arab Emirates. Bank Executive 1 and Bank Executive 2 maintained exclusive control of these accounts and refused to permit Compliance Officer 1 to review transactions through these accounts or conduct due diligence on the customers.

58.    Beginning in or around July 2018 when Compliance Officer 1 joined **BLUE OCEAN**, Compliance Officer 1 repeatedly requested access to customer account transaction records on **BLUE OCEAN**'s computer system.  **BLUE OCEAN** repeatedly denied Compliance Officer 1's requests until in or around March 2019, when Bank Executive 3 granted Compliance Officer 1 view-only privileges.

59.    In or around July 2019, OCFI examiners conducted an informal, on-site review at **BLUE OCEAN**.  In response to the informal OCFI review, **BLUE OCEAN** executives agreed to install transaction monitoring software to detect suspicious activity, as Compliance Officer 1 had repeatedly recommended.  In or around August 2019, Compliance Officer 1 and other **BLUE OCEAN** personnel met with a provider of transaction monitoring software.  Following that

meeting, Bank Executive 2 stated that he did not want to use the system, claiming that the system was inadequate for the types of transactions undertaken by **BLUE OCEAN**. **BLUE OCEAN** informed an OCFI examiner that the system did not fit the needs of the bank.

60.     In or around September 2020, Compliance Officer 1 resigned from **BLUE OCEAN**.

**E.     Throughout the conspiracy, BLUE OCEAN executives provided annual certifications to the bank's regulator, OCFI, attesting that BLUE OCEAN was fulfilling its BSA obligations.**

61.     From in or around October 2017 through in or around January 2022, **BLUE OCEAN**, acting through Bank Executive 2, Bank Executive 3, and others, submitted annual certifications to OCFI that falsely attested, among other things, that **BLUE OCEAN** "has implemented the necessary policies and procedures to ensure compliance with applicable provisions of the … Bank Secrecy Act" and that **BLUE OCEAN**'s management "is responsible for the establishment and implementation of an anti-money laundering program pursuant to the BSA." Bank Executive 2 signed and submitted such BSA compliance certifications on behalf of **BLUE OCEAN** to OCFI on or about September 6, 2018, and on or about September 12, 2019. Bank Executive 3 signed and submitted such BSA compliance certifications on behalf of **BLUE OCEAN** to OCFI on or about November 11, 2020, and on or about January 17, 2022.

All in violation of Title 18, United States Code, Section 371.

BRUCE D. BROWN

FOR JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

FELIPE PLECHAC-DIAZ
ASSISTANT UNITED STATES ATTORNEY

16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**

**CASE NO.** _____

v.

BLUE OCEAN INTERNATIONAL BANK,
LLC,

**CERTIFICATE OF TRIAL ATTORNEY**

_____ /
                    Defendant.

**Superseding Case Information:**

New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total Number of New Counts _____

**Court Division** (select one)
⊠ Miami    ☐ Key West    ☐ FTP
☐ FTL    ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) __No__
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:
   (Check only one)                    (Check only one)
   I    ⊠  0 to  5 days          ☐ Petty
   II   ☐  6 to 10 days          ☐ Minor
   III  ☐ 11 to 20 days          ☐ Misdemeanor
   IV   ☐ 21 to 60 days          ⊠ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) __No__
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) __No__
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) __No__
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? __No__
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? __No__
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? __No__
17. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026? __No__

By: _____
Felipe Plechac-Diaz
Assistant United States Attorney
FL Bar No.            0105483

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:  BLUE OCEAN INTERNATIONAL BANK, LLC,

Case No: _____

Count #1:

Conspiracy to Willfully Fail to Report Suspicious Transactions

18 U.S.C. § 371
* **Max. Term of Probation: 5 years**
* **Mandatory Min. Term of Probation (if applicable): 1 year**
* **Max. Supervised Release: N/A**
* **Max. Fine:  $500,000.00**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

United States of America            )
v.                                  )     Case No.    26-20293-CR-LEIBOWITZ/HERNANDEZ
BLUE OCEAN INTERNATIONAL BANK, LLC,   )
                                    )
_____      )
*Defendant*

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 83 (Rev. 06/09)  Summons in a Criminal Case

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| BLUE OCEAN INTERNATIONAL BANK, LLC, | ) | |
| | ) | Case No.   26-20293-CR-LEIBOWITZ/HERNANDEZ |
| | ) | |
| | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CRIMINAL CASE

    **YOU ARE SUMMONED** to appear before the United States district court at the time, date, and place set forth below to answer to one or more offenses or violations based on the following document filed with the court:

❐ Indictment      ❐ Superseding Indictment      ☑ Information    ❐ Superseding Information      ❐ Complaint

❐ Probation Violation Petition      ❐ Supervised Release Violation Petition    ❐ Violation Notice      ❐ Order of Court

| Place: | James Lawrence King Federal Justice Building 99 N.E. Fourth Street 10th Floor Miami, Florida 33132 | Courtroom No.:   10-6 |
|---|---|---|
| | | Date and Time:   08/28/2026 2:00 pm |

    This offense is briefly described as follows:

    18 U.S.C. § 371          Conspiracy to Willfully Fail to Report Suspicious Transactions

Date: _____

_____
*Issuing officer's signature*

_____
*Printed name and title*

I declare under penalty of perjury that I have:

❐ Executed and returned this summons          ❐ Returned this summons unexecuted

Date: _____

_____
*Server's signature*

_____
*Printed name and title*